May it please the Court, my name is Scott Martin and I represent Juan Perales in this appeal in the District Court's denial of his motion to suppress cocaine that was found in the search of his truck's engine compartment after he was stopped for a brake light violation on Highway 77. The agent who stopped him obtained his oral consent to search, but the circumstances were a bit unusual. The agent, who was actually a drug interdiction agent, retained Mr. Perales' driver's license and instructed him to sit in the front seat of the patrol car and then, in the presence of another agent, peppered him with questions about his itinerary, his ownership of the truck, and whether there was contraband in the truck, all before asking for Mr. Perales' consent to search. So the question in this case is whether the consent was voluntary. Mr. Perales argues the District Court erred in evaluating and weighing the factors that the Court must consider in deciding this question, especially the factor concerning the presence of coercive police procedures. Your Honors, this Court, as you know, determines voluntariness of consent by considering six factors, giving none, controlling weight, instead examining the totality of the circumstances. Three of the six factors we've conceded weigh in favor of the government, but only slightly. One of them is the extent and a level of defendant's cooperation with the police. Yes, Mr. Perales was cooperative, but this factor only marginally weighs in favor of the government because, as his daughter testified at the suppression hearing, he's not the type of person who would confront a police officer or argue with somebody with a badge. He's a compliant person, very respectful person. And this also comes across when you watch the video of the stop. He's very submissive to the agent. The second factor that weighs slightly in favor of the government is the defendant's education and intelligence. Although he has no legal training, he did receive a high school level education in Mexico, so this factor weighs slightly in the government's favor. There's no evidence that he's a person of below average intelligence. And the third that weighs slightly in favor of the government is the defendant's belief that no incriminating evidence will be found. This case is, this factor is almost neutral because there is no testimony on this. The drugs were found hidden in a manifold of the engine in a kind of a hide spot, so it wasn't really clearly erroneous for the district court to find that he, Mr. Perales, would not have expected that drugs would be found upon a cursory search of the engine. So that factor weighs a little bit in favor of the government, so we'll give them that. But our position is that those three factors are outweighed by the ones that are the most important. One is the defendant's ability to make an informed decision. One is the voluntariness of his custodial status. The agent in this case testified that when he asked Mr. Perales for consent to search, he was still not free to go. So we know that he was not free to go. So that factor weighs in favor of Mr. Perales. Another factor is the awareness of his right to refuse consent. The agent testified he never informed Mr. Perales of his right to refuse consent. So he didn't know. But if you ask someone something, there's almost a presumption that they can say no. Can I search your car? Well, if you can search the car without him giving consent, you go search the car. So I don't see why that's an issue. Well, he's not aware that he can say no. One of these factors is that he say, you have a right not to consent to this. And it didn't inform him of that. So under this situation, especially when you consider the coerciveness of the police tactics in this case, we think that he really, his ability to decline the request was significantly impaired. It seems to me that if the policeman asked you to sit in the front seat, that's a lot better than sitting in the back seat. Why is that coercive? Well, Your Honor, first of all, it is unusual. As we, for most people from experience, anyone who's been pulled over for speeding, you usually sit in your own car when the police goes back to run the computer checks. The district court in this case even acknowledged that this is somewhat unusual compared to cases we typically have. And it's actually unusual for the cases this court's seen too. Like in Cabot, which is one of the cases discussed in the brief. There the defendant lets, the officer lets the defendant stay in the minivan while running the computer checks and preparing a warning. The government will say this is about convenience, that this is just the officer wanted to input information into the computer so it should be just about his convenience. Well, our position is that's not persuasive. This agent's not an ordinary traffic cop. He's a drug interdiction agent. He sees this opportunity to question Mr. Prowlis for over eight minutes, more than 20 questions about his itinerary, ownership of the truck, and whether there's contraband in the car. We've listed a lot of those questions in our brief, pages 7 and 8 of the blue brief. The situation is not like Torres Verunda, which is a case that the government relies on. In that case, it was okay for the deputy to ask the defendant to sit in the front seat of the patrol car because he needed help with interpreting because the deputy didn't speak Spanish so he needed to call a Spanish-speaking agent to talk to him over the phone. That was okay. Well, we don't have that situation here because Agent Tamez, who is the agent who made the stop, could speak with Mr. Prowlis perfectly well in Spanish. Counsel, where was the second police officer during this time when the conversation was going on? In the car, Your Honor. In the back seat? Back seat of the car. And Agent Moya testified, was asked specifically on cross if the question was, on row 226, you were in the vehicle when this was occurring, correct? Correct. I don't see your brief saying much about him other than him or her, whatever it is, letting us know that there's another officer. You don't seem to put much weight on that. Is that a fair statement, that there was a second officer in the car? We have, in our brief, argued that adds a modicum of coerciveness to the situation, that you have an additional officer sitting in the back seat there, that that adds to it. That's one of the many factors in this case, the confluence of factors that make this a I'd say your best case is that more than just being evidence of coercion, this is necessarily coercive, the whole set of circumstances is necessarily coercive. Well, Cabot is our best, we believe is our best case. That's a case that not only is an example of a case where a defendant was allowed to sit in his own vehicle while the computer checks were being run, not put in the car. Also, that was a case where, as here, the agent basically withheld, retained the driver's license when he asked for consent to search. And in Cabot, this court sedated that retaining a person's license suggests coercion. This court said, in no uncertain terms, it said, we have previously concluded that an officer's retention of identification documents suggests coercion. And in Cabot, this court cited to Chavez Villarreal, that was a case where this court held that an agent's retention of an alien's identification documents when he asked for permission suggested coercion. In that case, this court said, the card was vital to the defendant's legal presence in this country. Without it, his disposition, if indeed not his ability, to decline the agent's request expectedly was significantly impaired. So here, too, Mr. Prowlis's ability to decline the agent's request to consent was significantly impaired by the fact that this agent had his license, you know, a person like Mr. Prowlis who is a compliant person with no legal training, has not been informed of his right to refuse consent, can be compelled into giving consent in this way. That's our position. Do you draw a distinction between cases where the computer check or license check has ended and the officer has otherwise determined, you know, either there's no basis for the ticket, et cetera, versus those cases where the computer check itself may take some period of time and the officer is nonetheless either continuing to talk, et cetera, et cetera, or do you say the temporal element really doesn't matter? Your Honor, our position is it shouldn't matter whether the stop is lawfully or unlawfully prolonged because, you know, a person like Mr. Prowlis, who I just mentioned, who doesn't have any legal training, can be coerced one way or another, whether it's prolonged or not. In Cabot, the case that we relied on, does not make that distinction. Brown, which is a case the government has cited, does not make that distinction. In fact, in Cabot, the court couldn't determine whether it was a reasonable suspicion to prolong the stop. In that case, it was an appeal to 2255 in Cabot, 2555 petition, and the court didn't say when it said that retaining a license suggests coercion, did not say that, you know, whether the stop is prolonged lawfully or not matters. And Chavez-Viriel didn't say that either. So our position is that basically the confluence of these factors is what made it coercive in this case, the questioning of the patrol car, the retaining of the license, the presence of a second agent, and the interrogation of the length of the questioning, even though it might have been lawful. This is why we didn't raise our argument here that the stop was unlawfully prolonged, because we don't know when the computer checks came back. That didn't come out in the testimony. In fact, the officer said, I'd have to look at my screens or whatever. We didn't, we couldn't really tell. You're not claiming that. No, we're not. We claimed that in the district court, but we're not arguing now that the stop was unlawfully prolonged, because we know from this court's cases that lots of, you know, that the stop ends when the computer checks come back clean. Here we don't, we just don't know. We don't know when they came back. The officer didn't know, and we weren't able to pin that down, and on the video you can't see the screen, so we don't really know. So you, you're putting your thrust on appeal on just the sort of inherently coercive circumstance that the defendant was in. That's what you're rising and falling on. Yes, Your Honor. Okay. Our argument is that, that what we, the ruling that we're looking for is that in this case it was coercive for a drug interdiction agent to retain a suspect's license, make him sit in the front of the patrol car, and in the presence of another agent, pepper him with questions about his itinerary, his ownership of the truck, and the presence of contraband, all before asking for his consent to search, and that these coercive tactics, together with the fact that the defendant was not free to leave and not informed of his right to refuse consent, made the consent involuntary. That's the, that's the, that's what we're looking for. But weren't those questions normal questions? You said twice you peppered him with questions. Well, he was, isn't this the case where the guy didn't know where the insurance policy was? Not initially, Your Honor, but it was, he did find the insurance document, it was in the glove compartment. Right, in the glove compartment, which is where normal people keep their insurance policies. Right. And this was a 30-day window for the insurance. So I don't see what, what rises to the description of being peppered. They seem like normal questions to me. Well, many of these questions are not normal, you know, about are there hidden weapons, cash money. There's no marijuana, nothing, there's no cocaine, heroin, anything, you know, that's, that's later in his questioning, but there's questions before that. I mean, it starts off with whose truck is this? How long have you had it? Where are you coming from? What are you doing in Brownsville? Where are you going? What type of work do you do? Is that a normal line of questioning? It's extensive for a case with a brake light violation. I don't, I think, believe that most people who are pulled over for a brake light violation would be, would be subjected to this many questions. We're not saying that the questions themselves are impermissible, but we're saying it adds to the coerciveness of the situation when you consider it with all the other factors that we have at play here. That we have a- You seem to be looking for a holding from us that's so, obviously you represent Mr. Perales, but you seem to be looking for something that's so uniquely just kind of these facts, you know, to carve out something different than what you argued below, and just to say it's an inherently coercive circumstance. Was it more coercive because there was this other agent in the back and the guy is, you know, feeling his eyes on him, you know, or you're saying, well, it's a brake light stop and you've made a lot out of these weren't, because most of the other cases involve, you know, drug intervention talking. Maybe later they call someone, this one may be different, and you've got these drug intervention people. So, it's the factors of two drug intervention people doing all these questions, is that what you argue makes this case sort of stand out from the heart line of other cases where we've said, you know, it's not inherently coercive? That, that, yes, yes and more, and the length of the questioning in the front seat of the patrol car, which is, this is unusual. Even the district court recognized that this is unusual for the cases that they see, and it's, these cases are always going to be fact driven cases, and this isn't. Sure, exactly. But you can look at the ones where we've reversed them and, you know, and you can look at others. Some have had to do with the timeline, the temporal element, and you've already told us that's not an issue here for you, not the prolonged nature of it. You've abandoned one of the arguments you had below, and I ask you and you said, I mean, you're staking your claim, basically, that this is almost an inherently coercive circumstance to wit, peppering of questions by a drug interdiction agent to Judge Clement's question. You say, no, they're not normal, ordinary questions, they're, you know, questions designed to get something. So, okay. I think we got it. Thank you. All right. Mr. Smith, I would assume you disagree. Pardon me, Your Honor? I would assume you disagree. I do respectfully disagree with Mr. Martin. May it please the Court, Jason Smith for the United States here. Just to straighten out the facts a little bit, this wasn't just a taillight stop with nothing else prompting Agent Tamez's questions. The initial check on the registration came back to someone named Medrano. So when Mr. Perales produces a driver's license with the Perales name, that's something that Agent Tamez needs to investigate. The initial radio check before the car stop happens also says that the insurance status is unconfirmed at the time that the car stop is initiated. And as Judge Clement noted, whenever Mr. Perales is pulled over, he initially can't find the insurance papers. He looks around the car and ultimately does find them. Agent Tamez does what he does with all traffic stops, asks Mr. Perales to step back into his car so that they can sit there together while Agent Tamez completes the computer screens that he has to do to issue a warning. And here the district court made a specific factual finding that Officer Tamez acted in a reasonable and timely manner, trying to gather information that he had every right to obtain in view of the evidence available to him as far as the ownership of the vehicle, the insurance, etc. What do you say, I mean this is, all these cases get cited back to us later depending on how we write them, you make it sound, or you do say that this particular agent always puts the driver in the front seat with him, we don't have much case law where that's happened, and whether that in itself heightens the pressure on the, I don't want to call it coercion quite yet, on the defendant or not is a question. Would you agree that it's not, we haven't dealt much with the effect, if at all, of having a defendant in the front seat? I think Torres-Borunda is the only case that I found that was dead on point for that, Your Honor. We frankly think Torres-Borunda is really on all fours here. The defendant was in the front seat as a matter of convenience, not as a matter of coercion. In Torres-Borunda it was in order to allow another agent to serve as an interpreter. Here it was so that Agent Tamez could have the back and forth necessary, both to investigate the ownership and insurance status of the vehicle, and so that he could complete those screens that needed to be done for the brake light warning. I wouldn't adopt the word pepper. Mr. Barton can use that, but it does seem to me that the questions go way afield from the purpose, ostensible purpose of the stop. And doesn't that in itself create anxiety, worry, pressure? I don't want to go to that last word, coercion, but it does seem to be adding to the pressures on the defendant. This Court has never, to my knowledge, addressed questioning as creating coercion so as to make consent involuntary. It certainly addressed the question of questions by an agent during a traffic stop in Chabaz, where this Court held that questions themselves are not problematic as long as they don't extend the stop beyond its constitutionally permissible time limit. That's what was going on here. And that last set of... Let me say something about that. It's one thing to say that we haven't addressed it in much detail. It's something else to say that if you stop for a traffic offense, you have some problem with the insurance, so that has to be worked through. You don't own the car. So that's sort of the nature of the stop. But then you've asked them if there's a dead body in the trunk or step back in the questions here. It does seem to me that heightens the concerns on the part of whoever is being questioned. It's sort of hard to ignore the nature of the questions. It certainly heightens concerns if one has a dead body in the trunk. That's going to make you nervous. Some automatic weapons in the trunk or a ton of cocaine. I mean, it does seem to me that all of that, I did take a certain extreme example, but it does seem to me that these other questions, stepping back from that, are also heighten the concern of the driver. And I think there's a difference between heightening concern and being coerced so that one's will is overborne and they don't feel able to say no. I suspect Mr. Perales was nervous and Agent Tamez thought he was nervous whenever they asked that last series of questions about drugs. And just to address that quickly, those questions about weapons, narcotics, those all fall, I believe the district court made a finding on this, within the last few seconds of the interaction. It's a page of the transcript of the interaction between Agent Tamez and Mr. Perales. Yes, he might have been nervous that those three kilos of cocaine hidden in the engine were going to be found. That doesn't make it coercive. And that's really, that's one of the factors that this court has laid out in the six-factor test is how likely is it that the defendant, or how likely does the defendant believe it is that the contraband is going to be found. Here, Mr. Perales had good reason to think that it wouldn't be found, given how well it was concealed within the engine. Was this a Chevrolet Silverado? It was. It was either a Chevy Silverado or a GMC equivalent. Didn't the arresting officer or someone testify that that's a pretty good place to hide drugs because there's that hidden compartment? It did. Wouldn't that add to the police's willingness to pursue questions about drugs? Yes. I think Agent Tamez listed quite a few things that aroused his suspicion. One of them was this particular vehicle, which has an engine, which Agent Tamez both had personal experience and training regarding it being used to conceal narcotics precisely where the narcotics were concealed in this case. Mr. Martin's argument really turns on trying to draw a bright line rule that seeking consent while still holding on to documents during the course of a traffic stop is necessarily coercive. It necessarily renders that involuntary consent, and this Court and the Supreme Court have in the case of Schneckloth v. Bustamante, the Supreme Court rejected that with respect to being advised of the right to refuse consent. There's no reason for imposing a single-factor test here of the kind that Mr. Martin has to rely on. I would say if Cabot is the best case for the defense position, that's pretty weak support because in Cabot, what this Court wound up saying was this needs to go back for a hearing so that the district court, it was in the context of a 2255, so the district court can make a determination about how valid this suppression claim was. If retaining documents was the kind of bright line automatic coercion that Mr. Martin suggests, this Court wouldn't have said this needs to go back for a hearing. This Court would have said counsel clearly rendered ineffective assistance, the police officers held on to defendant's documents, therefore there was a valid suppression claim here. If we were of such a mind to make a chart and put on one side the factors that add to the possibility of coercion and those that don't, the arguments made in the briefing at least by Mr. Barton that the fact that the driver was told that he's only going to get a warning added to the coercion, what's your reaction to that? I don't think that that's true in this case. There are certainly cases where this Court has found that to be true, they're factually distinguishable. I think Reynolds is one of those and in Reynolds, this Court found that asking for consent in connection with saying you're going to be free to go, I forget the exact wording, but it was something like can we just search your truck before you go was coercive because it implied you won't be free to go until we search that truck and that's not what happened here. There's a mention at the beginning of the stop regarding Agent Tamez issuing a warning. He then asks for consent completely separate from that. There is no implicit tie between the consent and receiving the warning or receiving a warning versus a ticket. So here, that just wouldn't affect the voluntariness of the consent. At the end of the day, under the applicable standard of review, in order to prevail, Mr. Perales has to show that it wasn't plausible that his consent was voluntary. Just to refresh my memory, I mean, one reason the question, we've got several cases with sort of different facts involving stops and as early on as we read these briefs, sometimes these facts sort of bleed in on which officer did what and so forth. In this case, it's the guy who can't find the insurance. Some other case we have, it's something else, so we're trying to ask the question on the right case here with the insurance, but my question is, I'm trying to remember, it was a refreshment member on when it was when the intervention officers got into the picture and the other officer in the back of the car? I believe that, well, Agent Sumas who's driving the car. It was a regular officer on the road that stopped him for the, whatever it was, warning light or whatever. The initial stop was made by an ordinary patrolman, right? No, Your Honor. Okay. The initial stop is made by Agent Sumas with the Kingsville Specialized Task Force. All right, got it. It is a traffic stop for a clearly burned out brake light. But he's got his particularized focus on drugs and interdiction and so on and so forth because of the nature. Okay. Correct, Your Honor. Got it, got it. Correct, Your Honor. All right. Now, what was the deal about the officer in the back? Now, I know you said he testified, he, Sumas testified sort of this was his routine in terms of putting people in was a testimony because I didn't read all of that about having a second officer, you know, in the back for safety or something else or was that part of the norm or did that just happen in this case? Agent Sumas testifies that Agent Moya, who's the second officer, was his ride-along partner for the day. There isn't much explanation about that and Agent Moya, I believe, testifies that he is in the back seat during the conversation between Agent Sumas and Mr. Perales. Again, I don't recall . . . But he doesn't testify that that's part of my routine, you know, I do the check and for safety purposes, you know, I have an officer in the back, boom-da-boom-da-boom, I mean, none of that just comes out, I mean, in this case he's there as, you know, the ride-along because, I mean, as I read it initially, I mean, the idea that there's this other officer sitting in the back and you're in the front, I mean, that . . . I'm not saying it does here, but that, to me, could auger up some coerciveness if, you know, you're between these two people and asking the questions, but I didn't remember that, and that's not being argued here, don't get me wrong, he doesn't argue that as a factor, the other officer, the other officer's kind of hardly mentioned, but because Sumas says it was sort of his routine, you know, to put people in the front, I was just curious whether that was part of his, quote, routine. He doesn't mention that, the video of the stop does indicate that Agent Moye is in the back, and frankly, from an officer safety perspective, that makes all the sense in the world. Well, it would to me, too, it just, he doesn't say, I mean, that's what I would have expected him to say right out the jump, to say, I do it as a matter of routine, but because I'm checking a computer, can't keep my eyes on the suspect, I have another person in it, that's what I would have expected, I mean, whether true or not, I would have expected that to be the initial statement about why, you know, that is, but conspicuous to me, that was not, you know, uttered, and so that's what made me wonder whether in this case it just happened that the other officer, because he's not mentioned as doing anything, asking any of the questions or anything else, he's just physically there. Right, and he wasn't during the video asking any questions, there isn't, I would disagree with the characterization of being peppered with questions, this certainly was not a hot bench in the car with two people firing questions at Mr. Perales, and just from an officer safety perspective, the other thing that I would mention is, it is much more sensible for Agent Moya to be in the car than to be standing next to a busy highway where, you know, he could get hit by a car, he could distract somebody, any number of things could happen. At the end of the day, to prevail, Mr. Perales has to show that it wasn't plausible that he voluntarily consented, and he just can't meet that standard. It is entirely plausible that he was sitting in a car, thought if he said yes, we can search, that it was very unlikely that that cocaine hidden deep in the engine of his truck would be found. Nothing about the circumstances suggests threats, coercion, some suggestions, some bad things going to happen to him if he didn't consent. They didn't threaten to call the K-9 unit? No, they did not. Unless the court has any other questions, I'll yield the rest of my time. All right. Thank you, sir. Thank you, sir. Appreciate it. All right. Mr. Moran, rebuttal. I have a few points I would like to make in response. First, Judge Stewart, to address questions you had for the government a few seconds ago about whether I had argued in my briefs about the presence of another officer. I did argue in page 16, footnote 12 of my blue brief, and also page 4 of my reply brief, that the presence of another officer likely added a modicum of coerciveness to the situation. I cited to Washington, which is a district court case out of the Northern District of Ohio, where a district judge in that case found that the presence of more than one officer adds to the coerciveness of a situation. In that case, was the second officer in the back seat? No. I think in that case, a second officer was just present. So I believe that being in the back seat is more coercive than even just the presence of other officers. It reminds me of those mafia movies where there's a guy right in the back seat and you feel pressure. I'm sure you'd think that, particularly after I said it, but that's not why I said it, to give you some juice for your rebuttal argument. I just want to point out that I did argue this in my briefs. I heard you quote from the reply brief, and I heard you quote from what page, but most people start with their strongest argument. And so the fact that it was in the reply brief suggests it wasn't your strongest argument put forth. But I got you. You reminded us. It's in there, Your Honor. Secondly, the government said at one point in its argument says that it mentions something about Mr. Perales' will was not overborne. Well, in this context, when we're talking about coercion, we're really talking about in the sense of compelling and after choice. We're not talking about overcoming somebody's will with bright lights and rubber hoses, the way you think of that way. If you look at Chavez via Real, that stands really for the proposition that coercion in this context is something that significantly impairs a person's disposition or ability to decline a request for consent to search. There it was holding on to the defendant's alien registration card, which the court found did significantly impair the alien's ability to decline the request. And so this is really a defendant-focused inquiry here. If Agent Tamez does this all the time, our view is that's a problem, and he's probably coercing a lot of people, and that probably ought to stop. The government says that this case is on all fours with Torres-Borunda, which is the case that it cites in its brief. As I said in opening, it's not on all fours because the reason why it was okay in that case for the deputy to put the defendant in the front seat of the patrol car was because he needed Spanish-language interpretation. That's a legitimate reason. If you could not speak with a man, you need to get on the phone and have a conversation on the phone with a Spanish-speaking agent. We don't have that here. Well, Kelsey, if we're looking at coercion and we're not from the viewpoint of the person who may be coerced, it doesn't seem to me that it's necessarily distinguishable on that level that somebody sitting in the front in order for the interpreter to have a better chance or somebody sitting in the front for whatever reasons fit in your case. It seems that those could be equally affecting the will of the person being questioned. Well, that's true, but I think not necessarily because I think in a case where an officer needs to speak with someone in Spanish, then the defendant would clearly understand why he's sitting there, and it's because I can't communicate with this person and we need to talk through an intermediary. It's not a situation where you've got somebody in the front seat of the car and you're sitting there and even though you can communicate perfectly. That's our position. Your Honor, as the government says, we're looking for a bright-line rule that holding onto someone's license is always coercive. No, we're not. We're saying that in Cabot this Court said that it suggests coercion. So it's one of the factors that goes into the mixed, and it's no different here. So it's your position they ought to give back the driver's license or the alien's Before they ask for consent, if they don't want to be acting coercively. This is about at the moment that they ask for consent to search the truck and whether that's coercive. It's not about whether it's okay for the officer to hold onto the license while he's completing the stop. The question is focused on how did you get this individual's consent to the search. And if you're holding onto his license while you're also asking questions and have him in the front seat of the car, and after you've already gotten him in your car telling him you're just going to get a warning and I'm going to let you go, which we think is just as coercive as in the Robertson case where that was what the officer said. We think that all these factors cumulatively show that this was coercive and that the factors weigh in favor of finding that this was not a volunteer consent. Thank you, Your Honor. Thank you, Mr. Martin. Thank you, Mr. Smith. Briefing and argument. The case will be submitted. We call the next case up. Romero.